**THOMSON McKINNON SECURITIES, INC., Plaintiff/Counterdefendant,**

v.

**MOORE'S FARM SUPPLY, INC., Defendant/Counterplaintiff.**

Civ. A. No. 81–2046.

United States District Court, W.D. Tennessee, W.D.

Feb. 9, 1983.

Saul Belz, Ellen Vergos, Memphis, Tenn., for plaintiff/counterdefendant.

John McQuiston, II, Leland McNabb, Memphis, Tenn., for defendant/counterplaintiff.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, ORDER

HORTON, District Judge.

Plaintiff, Thomson McKinnon Securities, Inc., brought this diversity action pursuant to 28 U.S.C. § 1332 for a monetary judgment against its former customer, Moore's Farm Supply, Inc. Plaintiff seeks a judgment for $21,645.00, the amount of an alleged deficit in the Moore's Farm Supply account after liquidation, plus interest and costs. Moore's Farm Supply denied liability and counterclaimed for damages alleging that McKinnon failed to follow specific trading instructions given by Moore's Farm Supply. McKinnon denied the allegations in the counterclaim and moved for its dismissal.

Two issues are presented in this case, (1) whether Carl Moore instructed Billy Joyner, McKinnon's account executive, during a telephone conversation on November 24, 1980, to liquidate Moore's account on November 25, 1980; and (2) if the Court finds those instructions were given, is Moore's precluded from asserting failure to follow those instructions because, McKinnon alleges, Moore's subsequently ratified its broker's actions.

After a thorough consideration of the entire record in this case, the Court finds that McKinnon failed to show by a preponderance of the evidence that it is entitled to a judgment of $21,645.00 against Moore's. On the other hand, the Court finds that Moore's has shown by a preponderance of the evidence that McKinnon failed to follow trading instructions to close the Moore's account on November 25, 1980. For that reason, the Court finds that judgment should be awarded the defendant, Moore's Farm Supply, Inc.

The parties stipulated the following facts:

1. Plaintiff, Thomson McKinnon Securities, Inc., is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business located at 3340 Peachtree, N.E., Suite 1000, Atlanta, Georgia, 30326, and is duly authorized to do business under the laws of the state of Tennessee, having offices at 1255 Lynnfield Road, Memphis, Tennessee 38119.

2. Defendant, Moore's Farm Supply, Inc., is a corporation duly authorized and existing under the laws of the state of Tennessee with its principal place of business in Selmer, Tennessee.

3. Plaintiff is a registered commodities futures commission merchant engaged in the brokerage of commodities for the accounts of others on various registered contract markets throughout the states.

4. On or about the 28th day of October, 1980, Carl Moore, on behalf of defendant, executed a customer agreement with plaintiff.

5. In addition, Carl Moore was furnished a Risk Disclosure Statement, setting forth the risks involved in commodity trading.

6. Thereafter, defendant bought and sold commodities futures contracts through plaintiff's Memphis, Tennessee office.

7. At the close of trading on November 24, 1980, the defendant had an equity account of $10,089.30.

Moore's Farm Supply is a family owned and operated business. Carl Moore is one of the owners of Moore's and is president of the business. Carl Moore, who did all of the trading in commodities on behalf of the company, is experienced in the purchase of grains and farm products. Moore has been trading in the commodities market for about eight years. He maintains a ticker tape in his business office in Selmer, Tennessee and uses it to monitor the commodity markets. Carl Moore, on behalf of Moore's Farm Supply, transacted commodity trading with Billy Joyner for several years before the dispute which is the subject of this lawsuit arose.

Billy Joyner has been a licensed commodity broker since 1975. Moore's Farm Supply became a customer of Billy Joyner in 1976 and remained his customer until 1980. Moore's account was with Clayton Brokerage Company from 1976 through October of 1980. Joyner was an account executive of

Clayton Brokerage Company during that time. Joyner, Cathey Austin, and others moved to the firm of Thomson McKinnon in November of 1980. Upon Joyner's request, Moore transferred the Moore's Farm Supply commodity trading account from Clayton Brokerage to Thomson McKinnon. Moore's Farm Supply also, during 1980, had a commodity trading account with Paine Webber Jackson & Curtis. Joyner had no discretion to place trades or otherwise act except upon Carl Moore's instructions. Moore's Farm Supply's trading account was what is known in the business as a nondiscretionary account.

Moore's account with Thomson McKinnon was opened on November 5, 1980. Trading was commenced on November 6, 1980. Carl Moore primarily engaged in "spread" trading. "Spread" trading occurs when a trader executes two trades at the same time— one to buy (or take a long position) the commodity for delivery in a specific month and the other to sell (or take a short position) the same commodity in a different delivery month. "Spread" trading is used generally to minimize losses. The trader acquires offsetting positions where a loss in one direction is likely to produce a corresponding profit in the other direction. Changes in the price spread between the two opposite positions or contracts determine whether a profit or loss will be realized by the trader.

Trading in the Moore's account on and after November 6, 1980, was conducted exclusively by means of telephone calls between Carl Moore and Joyner. In most instances after trades were executed, Thomson McKinnon mailed confirmation slips to Moore's Farm Supply. These confirmation slips were usually received by Moore's Farm Supply within two to three days after they were mailed. Testimony during the trial indicated not all confirmation slips were received by Moore's. There is no dispute between the parties about any trades in the account prior to November 24, 1980. The record reflects the account was actively traded from November 6, 1980, through November 24, 1980.

The commodity market during the time of this dispute was rather erratic and was described by Cathey Austin as "jumping all over the place." The soybean market began a serious and unusual decline during the week of November 24, 1980, and continued the following week.

The crux of the dispute between the parties centers on telephone conversations between Carl Moore and Billy Joyner. The most crucial of these telephone conversations is what was discussed by the parties and what instructions were given by Moore on November 24, 1980, regarding the Moore's account. Therefore, the resolution of the first issue presented in this case; whether Carl Moore instructed Joyner to liquidate the account during the November 24, 1980, conversations, must be determined by the Court judging the credibility of the two witnesses, Carl Moore and Billy Joyner. The Court must determine, based on the trial testimony, whether Carl Moore or Billy Joyner testified to a more accurate version of those conversations. Based on the trial testimony and a determination by the Court of the credibility of the witnesses, the Court finds that Carl Moore, on behalf of Moore's Farm Supply, is the more credible witness and that Carl Moore did instruct Billy Joyner on November 24, 1980, to liquidate the commodity trading account of Moore's on November 25, 1980. Carl Moore also stated in subsequent conversations with Joyner the account was to be liquidated on November 25, 1980. Joyner did not follow those instructions.

Carl Moore testified that he planned to go on an annual hunting trip to Cairo, Illinois, on November 24, 1980. Moore said he had two telephone conversations with Joyner before he departed on the hunting trip on November 24, 1980. The first conversation with Joyner occurred when the market opened on November 24, 1980. Moore testified as follows concerning the content of that conversation:

Well, he (Joyner) recommended some corn spreads and said we will day-trade [1] and get in and out. He (Joyner) said, I think we can pick up five cents. I said, okay, if you can do—if we can do it, let's do it, but have us out at the end of the day.

Moore testified there was no discussion between the two about bean spreads or the movement of the market.

The second conversation with Joyner occurred after the market closed about 2:30 in the afternoon of November 24, 1980. Moore told Joyner to "sell everything I have got, I am going goose hunting, I won't be where I can talk to you before Friday." Joyner responded "if that is what you want, that is what I will do." Cathey Austin, former Commodity Manager of Thomson McKinnon during the relevant times when this dispute occurred between the parties, testified that it is customary for customers to liquidate or reduce their positions before a long holiday. Austin has been engaged in the commodity business since 1975. Austin also worked as an account executive with Joyner at Clayton Brokerage Company and was one of the account executives who left Clayton Brokerage Company to open a branch office of Thomson McKinnon in Memphis, Tennessee, in November of 1980.

Mary Elizabeth Moore, Carl Moore's wife and part owner of Moore's Farm Supply, Inc., testified that she asked her husband on November 24, 1980, before he left on his hunting trip, what was to be done concerning the accounts at Thomson McKinnon and Payne Webber Jackson & Curtis. Moore told her he would take care of the trading. Mrs. Moore stated her husband called Joyner in her presence and instructed Joyner to "sell everything I have got." Mrs. Moore was not present when her husband called his broker at Payne Webber Jackson & Curtis.

Carl Moore did go on the hunting trip to Cairo, Illinois, on November 24, 1980. He returned to Selmer, Tennessee, on Wednes-

day afternoon, November 26, 1980. Thursday, November 27, 1980, was Thanksgiving Day. The commodity trading market was closed on November 27, 1980. Moore and Joyner did not communicate with one another concerning the account Tuesday, November 25, 1980, through Thursday, November 27, 1980. On Wednesday, November 26, 1980, Joyner traded the Moore's account in a "day-trade" by buying and selling 15,000 bushels of December corn. The trade resulted in a net loss in the account. No other trades were made by Joyner in the account between November 25, 1980, and November 28, 1980. The instructions of Carl Moore to Joyner "to sell everything I have got" were not carried out by Joyner.

Joyner called Moore at his office on November 28, 1980, and advised Moore there was a margin call of $7,000.00 on the account of Moore's Farm Supply. Moore told Joyner at that time that Joyner should have had him out of the market on the 25th of November, 1980, but if that is what was owed he would send the $7,000.00. Moore stated he was angry and surprised to find that he was still in the market. Moore testified in substance as follows:

Joyner called me. He said we got a deficit call of $7,000.00. I said, the hell we have. I said Bill, I told you to get me out. He said the market was down 7 cents and I decided not to get out. I agreed to send the $7,000.00. I said if that's what I owe you, I'll send it.

Mrs. Moore testified she heard part of this conversation of the 28th and her husband appeared surprised and angry. Carl Moore subsequently instructed his wife to mail Thomson McKinnon the check. The check was mailed and later received by Thomson McKinnon. Moore gave Joyner no trading instruction as to the account on the 28th.

There were no conversations between Joyner and Moore on either November 29 or November 30, 1980. On December 1, 1980,

---

1. Day-trading occurs when a trader initiates a position either to buy or sell and he intends to

get out of the trade that day.

Joyner telephoned Moore again and inquired about the $7,000.00 check he had agreed to send on the account. Moore told Joyner the check was in the mail and told Joyner again that the account should have been closed and sold out on the 25th of November, 1980. There was no discussion as to any additional margin call on the account on December 1, 1980. Joyner and Moore did not talk to each other on the telephone on December 2 and 3, 1980. On Thursday, December 4, 1980, Joyner telephoned Moore and said the account was still open and that it was in additional deficit. Moore told Joyner he considered the account closed since Tuesday, November 25, 1980, and he would not send anymore money on the account. Joyner also told Moore he would be out of the office on Friday, December 5, 1980, and gave Moore the name of another broker if he desired to trade. Carl Moore gave Joyner no additional instructions regarding the account.

Joyner told Cathey Austin on December 4, 1980, that he would not be in the office the next day because he was very nervous. Austin was first advised of the huge deficit in Moore's account on December 4, 1980. A margin clerk from Thomson McKinnon's New York office advised Austin the Moore's account should be liquidated if wired funds were not received. Austin stated after this conversation with the margin clerk, he advised Joyner of the position of the New York office and told Joyner he had to attend to the account by obtaining the needed funds from the customer. Joyner then called Moore. After this conversation with Moore, Joyner told Austin, Moore would call him the following day, December 5, 1980, and inform him if the funds would be forthcoming or to liquidate the account.

On December 5, 1980, Moore did not call Austin as Joyner had said. Instead, Austin called Moore. It was on December 5, 1980, when Austin first learned Moore was denying the trades in the account and that Moore's position was that Joyner was responsible for the deficit in the account because Moore had instructed Joyner on the 24th of November, 1980, to close the account on November 25, 1980. This con-

versation was rather brief since Austin knew the account had to be liquidated quickly because of the customer's position as well as the position of his New York office. Austin then liquidated the account. The account was liquidated on December 5, 1980. Austin experienced difficulty and delay in liquidating the account because he was not familiar with the account. He had to wait some five to fifteen minutes to determine from the New York office whether an order had already been placed to liquidate the account and because the market was very active at that time.

The Court notes that Joyner's testimony as to the contents of the conversations between the parties is contrary to the testimony of Carl and Mary Moore. The Court accepts the testimony of the Moores to be more credible than the testimony of Billy Joyner. It was admitted that Joyner has a hearing loss as well as an attention span problem as stated by Cathey Austin and also by Eddie Goode, who is the branch manager of Thomson McKinnon. In fact, the hearing loss suffered by Joyner was acute enough for Joyner to be moved into the line of sight of the office telephone operator and for an amplifier to be placed on Joyner's phone.

There are inconsistencies in Joyner's testimony which the Court cannot ignore or reconcile. These inconsistencies substantially diminish Joyner's credibility as a witness. Joyner testified that an account in deficit status could not be traded, yet he traded the Moore's Farm Supply account on November 26, 1980, in "day-trade" while there was a deficit in the account of $123.20 on the 25th of November, 1980, and a deficit of $1,745.20 on the 26th of November, 1980. A margin call of $6,023.20 was created on the account after trading on the 25th of November. Joyner received a "margin run" and an "equity run" on each account he handled every morning. Joyner, therefore knew the account was in a deficit status and there was an outstanding margin call on the account before he "day-traded" the account on the 26th of November, 1980. Joyner stated he violated no rules by trad-

ing the account in deficit on November 25, 1980. However Cathey Austin, Commodity Manager at Thomson McKinnon during this time, who the Court finds to be an extremely credible, forthright and believable witness, testified Thomson McKinnon's rules prohibited trades in an account in deficit status and that trading on the basis of parimeters established two days earlier indicate a discretionary trade forbidden by the customer agreement as well as the rules of Thomson McKinnon. Mr. Austin stated that in his opinion it was dishonest to deal in such a discretionary trade. When Austin was specifically asked by plaintiff's attorney whether he had ever known Joyner to have been dishonest in dealings with a customer, he responded:

A: Mr. Joyner related that experience that he had at Clayton Brokerage Company that I had no knowledge of. He did a discretionary trade with a man in Jackson, Tennessee, the man said that he was not going to accept the trade and Billy had to go borrow some money to take a check up to the man at Jackson, Tennessee, so that he could pay that deficit he had in the account.

Q: Well, I am asking you if you he ever was dishonest in any way in any dealings with his customers, that is, dishonest in a discretionary trade.

A: In my opinion a broker is in a fiduciary relationship and owes his allegiance to the customers, the company second, and himself third.

It is important to note, Austin had given Joyner his support when the dispute initially arose between the parties. Austin protested vehemently when the company initially decided to have Joyner pay the deficit in the ·account after learning of Carl Moore's allegation Joyner had failed to follow instructions to liquidate the account. Austin stated he supported Joyner initially because he felt the company was acting too hastily and the company should protect its brokers from deadbeats. Austin indicated his initial support was also influenced by the fact he was led to believe the dispute would be settled without going to trial.

Austin was not told by Joyner when the dispute arose that Moore refused to accept the trade. Austin was advised of the extent of the deficit in the account not by Joyner but by the New York office. Austin first heard of the failure to follow instructions charge on December 5, 1980. Austin apparently withdrew his strong support of Joyner in the summer of 1982. In the summer of 1982, Austin learned for the first time from Joyner that Carl Moore had asked to speak to the manager at Thomson McKinnon on December 4, 1980. Austin placed great significance on this revelation by Joyner and so does the Court. When questioned about his change of support, Austin responded:

Q: Why did you change your support?

A: Mr. Joyner and I were discussing the case and he was telling me that he was not going to be charged with the deficit, that it looked as if the case might be settled, and I had been told all along that the case would be settled. And his parting words were the only thing the man objected to was that he wanted to talk to the manager, and then he excused himself because he had another phone call.

Q: How did it take place?

A: How did what take place?

Q: Your conversation with Mr. Joyner?

A: He was telling me, you know, his side of the story.

Q: Were you face to face?

A: No, it was over the phone.

Q: What was your reaction to the statement made to you as you have just testified to by Mr. Joyner that all the man said was that he wanted to talk to the manager?

A: I almost dropped the phone, I flushed, that was the first time that I ever knew that Mr. Moore wanted to talk to me prior to December 5th.

Austin stated after he was informed of the customer's wish to talk to him, he telephoned Carl Moore and told him he had

some information Moore's lawyer needed to know and might find of interest. Austin stated the significance he placed on his conversation with Joyner in the summer of 1982 was that Joyner should have told him on December 4, 1980, that Moore wished to speak to the manager because such a request from a customer indicates there is a problem with the account and the customer wishes to talk with someone in authority.

The Court cannot understand why Joyner waited almost two years before he told Austin that Moore wished to talk with him on December 4, 1980, especially considering that Austin and Joyner had discussed the deficit in the account.

■ The execution of the customer agreement on October 25, 1980, established the relationship of principal and agent between Thomson McKinnon and Moore's Farm Supply. Thomson McKinnon was bound to follow instructions of its principal, Moore's Farm Supply. Billy Joyner was an agent of Moore's Farm Supply as well as an agent of his employer, Thomson McKinnon, and bound to follow instructions of Moore's as to the trading in the account. *Nidiffer v. Clinchfield R. Co.,* 600 S.W.2d 242 (Ct. App.Tenn.1980). Agency in the broadest sense of the word includes every relation in which one person acts for or represents another and the principal has the right to control the actions of the agent. An essential element in the relationship of principal and agent is that the object of the contract between the parties is to benefit the principal. *Foster Trailer Co. v. U.S. Fidelity & Guaranty Co.,* 190 Tenn. 181, 228 S.W.2d 107 (1950); *Howard v. Haven,* 198 Tenn. 572, 281 S.W.2d 480 (1955); *Fisher v. Trion, Inc.,* 49 Tenn.App. 182, 353 S.W.2d 406 (1961). "An agent stands in a fiduciary relationship to his principal and is under a duty to be careful, skillful, diligent and loyal in the performance of his principal's business and failure to so act subjects the agent to liability to his principal for any damages naturally and proximately flowing from the breach of his duty." *Gay & Taylor, Inc. v. American Casualty Co. of Reading, Pa.* 53 Tenn.App. 120, 381 S.W.2d 304,

305 (1963). The relationship of principal and agent is based on trust and confidence. *Chisholm v. Western Reserves Oil Co.,* 655 F.2d 94, 96 (6th Cir.1981); *Heard v. Miles,* 32 Tenn.App. 410, 222 S.W.2d 848 (1949). Carl Moore transferred Moore's Farm Supply's account to Thomson McKinnon based on the trust and confidence he, Moore, had in Joyner as a broker.

■ Moore's Farm Supply has shown by a preponderance of the evidence its agent Thomson McKinnon, through its employee, Joyner, failed to follow instructions and breached its duty of due diligence which it owed to its principal, Moore's. Joyner failed to liquidate the commodity trading account of Moore's Farm Supply when he was instructed to do so on November 24, 1980. *Jermyn v. The Seigel Trading Co.,* Comm.Fut.L.Rep. CCH ¶ 20,700 (1978); *Photakis v. Madda Trading Co.,* Comm.Fut. L.Rep. CCH ¶ 20,504 (1977). The Court therefore finds from all of the evidence in the record and upon the law that Moore's Farm Supply is not liable to Thomson McKinnon for any deficit in the account which proximately flowed from Thomson McKinnon's breach of duty. *Gay, supra.*

To avoid liability to Moore's Farm Supply for the breach of its duty, Thomson McKinnon relies on the doctrine of ratification. Thomson McKinnon asserts Moore's ratified Joyner's actions since Moore's did not submit its complaint against Joyner to writing within ten days after it became aware of Joyner's failure to follow instructions. Plaintiff asserts defendant signed the customer agreement which provided that the customer had the responsibility to promptly notify Thomson McKinnon in writing of any alleged complaints regarding its account. Carl Moore did not submit his complaint in writing. As stated previously, all dealings between the parties relating to trading in the Moore's account were oral.

At no time after the plaintiff became fully aware of the defendant's charge against Joyner did it ask Moore to submit the complaint to writing. Officials at Thomson McKinnon investigated the complaint without a written complaint from

defendant. Austin liquidated the account on December 5, 1980, partially upon the oral protest of Carl Moore.

Furthermore, the confirmation slips sent to customers to confirm certain trades made in the account instructed the customer to contact his account executive immediately if there were questions in regard to the account. Also on the same slip appeared language that the trade would be deemed to be correct unless the customer immediately sent written notice to challenge the trade. The customer was given inconsistent instructions on how to report disputes, orally to the account executive or in writing directly to Thomson McKinnon.

Carl Moore protested trading in the account when Joyner first demanded a margin call on the account November 28, 1980, the date Moore learned his instructions had not been followed. Moore continued to deny trades made in the account in subsequent conversations he had with Joyner on December 1 and 4, 1980. Moore testified he never called the office manager because he had always dealt strictly with Joyner and did not think he needed to call the manager. Austin was also informed by Joyner in the summer of 1982, that Moore had requested to speak to the manager on December 4, 1980. Moore also promptly denounced the trade when Austin called him on December 5, 1980, concerning the deficit in the account.

■ Moore expressly repudiated Joyner's actions on four separate occasions and has continued to do so to this date. Ratification can be applied only in those cases where it is clear from all the circumstances that the principal, with full knowledge of all the facts, had the intent to adopt the actions of the agent. *Sherwood v. Madda Trading Co.,* Comm.Fut.L.Rep. CCH ¶ 20,-728 (1979); *Kessenich v. Rosenthal & Co., et al.,* Comm.Fut.L.Rep. CCH ¶ 21,181 (1981); *Osborne Co. v. Baker,* 35 Tenn.App. 300, 245 S.W.2d 419 (1952); *Howard, supra.* Plaintiff bears the burden of proof on its ratification claim. *McCurnin v. Kohlmeyer & Co.,* 477 F.2d 113 (5th Cir.1973); *Kessenich, supra.* Evidence of ratification must be substantial in nature and must be supported by substantial evidence. *Kessenich, supra; Donato v. Shearson Hayden Stone, Inc., et al.,* Comm.Fut.L.Rep. CCH ¶ 20,645 (1978). The Court finds that Thomson McKinnon has not carried its burden to show a ratification of its actions by Moore's. Carl Moore's actions do not support a finding that a ratification of Joyner's actions occurred. Actually, Moore complained at every opportunity about the unauthorized actions of Joyner.

■ A failure to follow instructions by the agent renders the agent liable to the principal for losses in damages proximately flowing from such failure. *Gay, supra.* Defendant is entitled to be placed in the position it would have been if its order of liquidation had been followed. The measure of damages is the value of the commodity account of Moore's Farm Supply had the trading instructions regarding the account been carried out. *Donato, supra.* Plaintiff asserts even if the Court finds Joyner failed to follow instructions and the account had been liquidated on November 25, 1980, Moore's still owes plaintiff $10,907.20, the amount of deficit in the account. If there was a legitimate deficit in the account on the 25th, Moore's Farm Supply would owe this amount to plaintiff. *Shearson, Hayden, Stone Inc., v. Liddell,* 518 F.Supp. 1124 (E.D.La.1981). Defendant asserts the amount it is entitled to receive is the credit amount of $4,967.30 which would have been in the account had it been liquidated on the morning of the 25th plus the $7,000.00 it mailed to plaintiff on December 1, 1980. On the other hand, plaintiff seeks to recover from the defendant $21,645.00 the amount of the deficit in defendant's commodity trading account after liquidation plus interest on that amount and costs.

The Court finds from all of the proof in the record and upon the law that judgment should be awarded the defendant Moore's Farm Supply, Inc. It is apparent to the Court, from the evidence, that had Mr. Joyner followed the instructions of Mr. Moore, there would not have been a deficit in the Moore's account at the opening of the mar-

ket on November 25, 1980. Since Moore, on behalf of defendant Moore's, paid the $7,000.00 only "if" he owed the funds, the Court finds he did not owe that sum and is entitled to recover the $7,000.00 from plaintiff. *Knight Newspapers, Inc. v. U.S.*, 395 F.2d 353, 357 (6th Cir.1968).

To avoid error as to the actual cash value of the Moore's account at the opening of the market on November 25, 1980, the Court directs the attorneys for the parties to try and resolve this matter. If they are unable to do so, the Court directs the parties to select a neutral commodity trading firm and ask that firm to determine the value of the Moore's account at the opening of the market on November 25, 1980, assuming the account had been liquidated at that time. The attorneys should file a written report with the Court within 15 days from the date of this Order. Immediately thereafter, a final judgment will be entered, which judgment should be prepared and presented to the Court by counsel for the defendant, Moore's Farm Supply, Inc.