907 F.2d 150
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
J.C. BRADFORD FUTURES, INC., Plaintiff-Appellant,
v.
DAHLONEGA MINT, INC., Defendant-Appellee.
 No. 89-5581.
 United States Court of Appeals, Sixth Circuit.
 July 11, 1990.
 
 Before RALPH B. GUY, Jr. and DAVID A. NELSON, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 In this diversity action concerning the liquidation of silver futures contracts, the district court entered a $655,000 judgment in favor of defendant and counter-plaintiff, Dahlonega Mint, Inc. (Dahlonega), and against plaintiff and counter-defendant, J.C. Bradford Futures, Inc. (Bradford), following a jury trial. Bradford brings this appeal from the judgment and the denial of its post-trial motions for judgment notwithstanding the verdict and for a new trial. Because we find that the district court incorrectly instructed the jury and erroneously excluded relevant evidence regarding prices and commodities exchange margin requirements in the silver futures market, we shall vacate the judgment and remand the case for a new trial.
 
 I.
 
 2
 Bradford, a registered broker-dealer and futures commission merchant, began its brokerage relationship with Dahlonega on March 31, 1986. Dahlonega opened a margin account in commodities futures with Bradford at that time to obtain silver for its business endeavors. Specifically, Dahlonega needed silver in large quantities to produce the various precious metal products such as coins and medallions that it sold. Thus, Dahlonega intended to participate in the silver futures market as a long-term investor planning to take delivery on its contracts, rather than as a speculator seeking short-term profits from fluctuations in silver prices.
 
 
 3
 Acting through company president and sole owner Lewis Revels, Dahlonega executed a written customer agreement with Bradford at the inception of the parties' relationship. Under the terms of the agreement, Dahlonega consented to maintain an account balance sufficient to meet any margin requirement set by Bradford.[1] The agreement further entitled Bradford to change the margin requirements "at any time without prior notice to [the] Customer." (App. at 139). Additionally, the agreement authorized Bradford "in its sole and absolute discretion to close out [Dahlonega]'s account in whole or in part" if "the property deposited in [Dahlonega]'s account shall be determined by Bradford, in its sole and absolute discretion, and regardless of current market quotations, to be inadequate to secure the account" or if "[Dahlonega]'s account shall incur a deficit balance[.]" (App. at 139).
 
 
 4
 After Dahlonega had maintained its account with Bradford for more than one year, the account included a substantial number of silver contracts. By midmorning on Monday, April 27, 1987, Dahlonega held 170 contracts for summer and fall deliveries totalling 850,000 ounces of silver.[2] Because the purchase prices under the various contracts exceeded ten dollars per ounce, the total amount of Dahlonega's purchase obligations approached $9 million. However, the operative margin requirement of $2,500 per contract required Dahlonega to maintain an account balance of only $425,000 to lock in its positions on the 170 contracts.
 
 
 5
 Early in the trading session on April 27, 1987, silver commanded a price above $11 per ounce. The escalating price of silver, which reached the $11 plateau as a result of a run-up, prompted an increase in the exchange margin to $3,300 per contract. Market analysts at Bradford shared the exchange's concern that the $11 price was inflated and, therefore, subject to rapid decline. Consequently, Bradford president Douglas Kitchen unilaterally ordered an immediate increase in the brokerage margin for silver from $2,500 per contract to $15,000 per contract. The decree was communicated to Bradford's brokers, including Ron LaChance, who handled the Dahlonega account. LaChance told Kitchen that the new margin requirement was excessive (App. at 298), and estimated that Dahlonega would have to add $1.6 million to its account in order to meet Bradford's $15,000 per contract margin requirement.[3]
 
 
 6
 By late morning on April 27, 1987, the price of silver began to fall. Between 12:25 and 12:40 p.m., Revels called Bradford to ascertain the market price of silver; Revels explained that the quote machine in his office was malfunctioning, thus leaving him uncertain about the market's recent activity. LaChance returned Revels' call several minutes later to inform Revels that the price of silver had dropped to a range of $8.15 to $8.10 per ounce, and to communicate Bradford's new margin requirement to Revels. When LaChance informed Revels that Bradford wanted $1.6 million from Dahlonega to satisfy the margin requirement, Revels first called the new margin "ridiculous" (App. at 400), but then offered to provide LaChance with a check for $500,000. (App. at 401). While LaChance related Revels' offer to Bradford's management, Revels called his bank and discovered that Dahlonega had only $467,000 immediately available. (App. at 401).
 
 
 7
 As soon as Bradford's management learned that Dahlonega could not promptly meet the margin call, Bradford ordered the liquidation of all 170 Dahlonega silver futures contracts. The liquidation order was transmitted to the exchange floor and entered at 12:59 p.m. The cost of liquidating Dahlonega's silver contracts totally depleted Dahlonega's account and, in fact, resulted in an account deficit of $172,005.88. In the aftermath of the liquidation, Dahlonega declined Bradford's invitation to reestablish a position of 50 silver contracts at a margin of $5,000. Rather, Dahlonega waited until May 1, 1987, to reenter the market through a different brokerage firm.
 
 
 8
 On May 20, 1987, Bradford filed this action against Dahlonega in the United States District Court for the Middle District of Tennessee to collect the $172,005.88 account deficit resulting from the liquidation. Dahlonega then filed suit against Bradford on June 22, 1987, in the United States District Court for the Northern District of Georgia seeking wrongful liquidation damages based upon breach of contract, breach of fiduciary duty, and negligence theories. Dahlonega's claims subsequently were transferred to the Middle District of Tennessee and consolidated for trial with Bradford's claim.[4] (App. at 27). The consolidated cases were tried to a jury, which returned a $655,000 verdict in favor of Dahlonega on March 9, 1989. The district court entered judgment on the following day. Bradford then filed a motion for a new trial on March 17, 1989, and a motion for JNOV on March 23, 1989. The district court did not issue a written order disposing of either motion, but simply wrote the word "denied" on each motion and apparently signed or initialled both notations.[5] This appeal followed.
 
 
 9
 Bradford contends on appeal that the district court erred in denying its motion for JNOV with respect to the account deficit of $172,005.88. Bradford further argues that the district court erroneously denied its motion for a new trial based upon improper exclusion of relevant evidence and incorrect instructions given to the jury. We shall consider these assignments of error seriatim.
 
 II.
 
 10
 This court follows the minority view that, in diversity cases, "state law governs the standard for granting directed verdict and judgment notwithstanding the verdict motions." Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable and Cold Storage Co., 709 F.2d 427, 430 n. 3 (6th Cir.1983); see also Boynton v. TRW, Inc., 858 F.2d 1178, 1186 (6th Cir.1988) (en banc). Applying Tennessee law, we must review the ruling on Bradford's motion for JNOV under the same standard of review applicable to rulings on motions for directed verdict. See, e.g., Kaley by Lanham v. Union Planters Nat'l Bank of Memphis, Tennessee, 775 S.W.2d 607, 611 (Tenn.App.1988). Tennessee law requires trial courts presented with directed verdict motions to:
 
 
 11
 take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion where there is any doubt as to the conclusions to be drawn from the whole evidence. A verdict should not be directed during, or after, trial except where a reasonable mind could draw but one conclusion.
 
 
 12
 Id. (quoting Holmes v. Wilson, 551 S.W.2d 682, 685 (Tenn.1977)); accord Arms v. State Farm Fire & Casualty Co., 731 F.2d 1245, 1248 (6th Cir.1984) (quoting Holmes, 551 S.W.2d at 685). "In both the Tennessee and federal court systems, an appellate court reviewing a trial court's action on a [JNOV] motion applies the same standard as used in the trial court." Arms, 731 F.2d at 1249; see also Kaley by Lanham, 775 S.W.2d at 611.
 
 
 13
 Bradford's JNOV motion focused exclusively upon its claim for $172,005.88, the amount of Dahlonega's account deficit. Bradford renews the argument on appeal that, pursuant to the customer agreement, it had the authority to make the margin call on April 27, 1987, and then liquidate all 170 silver futures contracts when Dahlonega failed to meet the margin call. We agree that the customer agreement provided Bradford with sweeping rights to set margins and close out undermargined accounts. See, e.g., Dean Witter and Co. v. Tiger Tail Farms, Inc., 674 S.W.2d 699, 702 (Tenn.1984) (applying New York law). However, "where a customer agreement is in effect, the broker does not have unbridled discretion to liquidate an account; its power to liquidate must be exercised in good faith under the existing facts and circumstances." Cauble v. Mabon Nugent & Co., 594 F.Supp. 985, 992 (S.D.N.Y.1984); cf. also Solomon v. First American Nat'l Bank of Nashville, 774 S.W.2d 935, 945 (Tenn.App.1989) ("It may be reasonably argued that, where a contract grants discretionary powers to one party, there is an implied agreement that such powers will be reasonably exercised.").
 
 
 14
 The proper balance between Bradford's broad contractual rights to set margins and liquidate undermargined accounts and the concomitant requirement that such actions be undertaken in good faith can be expressed in the following phrase: "as long as [it] acted in good faith, [Bradford] had authority to liquidate the account without notice once it was undermargined and undercollateralized." Modern Settings, Inc. v. Prudential-Bache Securities, Inc., 709 F.Supp. 70, 74-75 (S.D.N.Y.1989). The good faith limitation upon Bradford's rights interposed as a defense by Dahlonega, although extremely narrow, presents a jury question on the facts of this case.[6] Cf. Tiger Tail, 674 S.W.2d at 702 (indicating that reasonableness in enforcing margin requirements is a jury issue). Accordingly, we find that the district court properly denied Bradford's motion for judgment notwithstanding the verdict on its claim against Dahlonega. For reasons that follow, however, the verdict on Bradford's claim (as well as the $655,000 verdict on Dahlonega's counterclaims) must be vacated and remanded for retrial.
 
 III.
 
 15
 "In a diversity case, the question of whether a new trial is to be granted is a federal procedural question and is to be decided by reference to federal law." Toth v. Yoder Co., 749 F.2d 1190, 1197 (6th Cir.1984); see also Arms, 731 F.2d at 1248 n. 2. "Generally, the grant or denial of a new trial is purely within the discretion of the trial court and will not be reversed except upon a showing [of] abuse of discretion." Logan v. Dayton Hudson Corp., 865 F.2d 789, 790 (6th Cir.1989). However, "[i]f a trial court has improperly [excluded] evidence and a substantial right of a party has been affected," a new trial may be ordered "on all or part of the issues[.]" Id. Likewise, if jury instructions, " 'taken as a whole, are misleading or give an inadequate understanding of the law[,]' " a new trial is appropriate. Lewis v. City of Irvine, Kentucky, 899 F.2d 451, --- (6th Cir.1990) (quoting Bowman v. Koch Transfer Co., 862 F.2d 1257, 1263 (6th Cir.1988)).
 
 A.
 
 16
 On April 28, 1987, the day after Bradford liquidated Dahlonega's contracts, the Comex exchange raised the margin on silver futures contracts from $3,300 to $8,000. This substantial increase in the exchange margin, which applied to all contracts, see supra note 1, presumably was precipitated by pervasive concern about the impact of the rapid decline in silver prices. Despite Bradford's repeated attempts to present evidence concerning the April 28, 1987, increase in the exchange margin, the district court refused to allow any evidence on this point. We find that the district court abused its discretion in this respect. Because Bradford's rights to set margins and liquidate undermargined accounts were constrained only by the requirement that such actions be undertaken in good faith, see Modern Settings, 709 F.Supp. at 74-75, evidence that the exchange margin significantly increased soon after Bradford raised its brokerage margin is extremely relevant. By excluding such evidence, the district court deprived Bradford of the opportunity to establish good faith by demonstrating that its April 27, 1987, margin call was similar in scope and timing to action taken on April 28, 1987, by the exchange itself. Cf. Tiger Tail, 674 S.W.2d at 701-02 (margin increase instituted by exchange is irrefutably proper).
 
 
 17
 The district court further refused to permit Bradford to introduce evidence of market prices following the liquidation of Dahlonega's contracts. This also constituted an abuse of discretion "inconsistent with substantial justice." See Fed.R.Civ.P. 61 (setting harmless error standard). The ordinary measure of damages for wrongful liquidation is the total amount of commissions charged by the broker for liquidating the contracts plus the difference between the liquidation price and the lowest "market price within a reasonable time" after liquidation.[7] Cf. Tiger Tail, 674 S.W.2d at 703-04 (articulating standard for measuring damages "in the case of an unauthorized covering of a short sale"). Here, the jury must determine what amounts to a "reasonable time" after liquidation,[8] and then must know the market prices to assess the loss, if any, suffered by Dahlonega in reestablishing its positions following liquidation. By preventing the jury from understanding the market conditions faced by Dahlonega in the wake of liquidation, the district court erroneously precluded the jury from rendering a verdict that accurately determined the loss sustained by Dahlonega.
 
 B.
 
 18
 The district court also erred in instructing the jury on Dahlonega's claim that Bradford breached a fiduciary duty owned to Dahlonega. The extent of a broker's obligation to a customer depends upon the nature of the customer's account. Although a broker "operating a discretionary account--in which the broker determines which investments to make--is viewed as a fiduciary[,]" Commodity Futures Trading Comm'n v. Heritage Capital Advisory Serv., Ltd., 823 F.2d 171, 173 (7th Cir.1987), it is generally accepted that "no fiduciary duty arises between a broker and his client in relation to a non-discretionary commodity trading account."[9] Greenwood v. Dittmer, 776 F.2d 785, 788 (8th Cir.1985) (applying Arkansas law); accord Heritage Capital, 823 F.2d at 173; Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 461 F.Supp. 951, 952-53 (E.D.Mich.1978), aff'd, 647 F.2d 165 (6th Cir.1981); see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng, --- F.2d ----, ---- (D.C.Cir.1990) (collecting cases); but see Romano v. Merrill Lynch, Pierce, Fenner & Smith, 834 F.2d 523, 530 (5th Cir.1987) (finding "no bright-line distinction between the fiduciary duty owed customers regarding discretionary as opposed to nondiscretionary accounts"), cert. denied, 487 U.S. 1205 (1988). Duties to customers with nondiscretionary accounts are transactional in nature. See Leib, 461 F.Supp. at 952-53; see also Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc., 769 F.2d 561, 567 (9th Cir.1985). Thus, with respect to nondiscretionary accounts, "[a] broker has no continuing duty to keep abreast of financial information which may affect his customer's portfolio or to inform his customer of developments which could influence his investments." Leib, 461 F.Supp. at 953; accord Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 732 F.2d 859, 862 (11th Cir.1984). Instead, the broker simply must act in accordance with the customer's directions concerning a nondiscretionary account.[10] See Leib, 461 F.Supp. at 953 (defining "[d]uties associated with a non-discretionary account").
 
 
 19
 In this case, the district court presumed that Bradford owed a broad fiduciary duty to Dahlonega and accordingly instructed the jury in the following terms:
 
 
 20
 When a broker and its client enter into a principal-agent relationship, such as in this case, the broker acquires fiduciary duties towards the client. Such duties include the duty to be careful, skillful, diligent, loyal, and to make timely, full and complete disclosure of facts that will benefit the principal.
 
 
 21
 It is for you to determine whether Bradford, as agent, violated its fiduciary duties to deal fairly and honestly with Dahlonega Mint, Inc. or to disclose to Dahlonega any conflict of interest. However, Bradford had no duty to disclose matters within the knowledge of Dahlonega.
 
 
 22
 (App. at 596). This instruction incorrectly defined the scope of Bradford's responsibility with respect to Dahlonega's discretionary account. First, the instruction improperly suggested that Bradford's duty was more than transactional by indicating that Bradford had a continuing duty to keep Dahlonega informed of all developments in the market. Second, the instruction outlined Bradford's obligation in sweeping, nebulous terms. As the Tenth Circuit observed:
 
 
 23
 A fiduciary duty ... cannot be defined by asking the jury to determine simply whether the principal reposed "trust and confidence" in the agent. The jury should have been instructed to decide first what [the broker] had agreed to do for [the customer] and then to determine whether [the broker] executed those tasks properly.
 
 
 24
 Hill v. Bache Halsey Stuart Shields Inc., 790 F.2d 817, 824 (10th Cir.1986) (applying Colorado law). These flaws in the fiduciary duty instruction provide further support for our conclusion that a new trial is necessary.[11] Accordingly, the judgment entered on the verdict must be VACATED and the case REMANDED for a new trial on all claims raised by both parties.
 
 
 
 [1]
 Investors in the silver futures market need not put up the entire value of a silver contract to obtain the right to delivery on the contract. Instead, a small percentage of the contract price, which is typically called a margin, will permit an investor to hold the right to take delivery at a specified price on a silver contract at some future date. Brokers such as Bradford ordinarily set margin requirements applicable to their customers' accounts, and the commodities exchanges establish margin requirements uniformly applicable to all participants in the market. See generally Chicago Mercantile Exch. v. SEC, 883 F.2d 537, 542 (7th Cir.1989). The customer agreement signed by Dahlonega expressly gave Bradford the authority to set margin requirements that "may exceed or differ from those requirements set by any commodity exchange...." (App. at 139)
 
 
 [2]
 Each contract required Dahlonega to take delivery of 5,000 ounces of silver, thus yielding a total obligation of 850,000 ounces on the 170 contracts
 
 
 [3]
 Dahlonega's account contained approximately $1.1 million in equity on April 27, 1987, whereas the margin of $15,000 per contract required more than $2.5 million merely to cover the 170 silver contracts
 
 
 [4]
 In each of the two cases, subject-matter jurisdiction was predicated upon diversity of citizenship. See 28 U.S.C. Sec. 1332(a). The parties agree that Tennessee law controls the claims in each of the two actions
 
 
 [5]
 In United States v. Woods, 885 F.2d 352 (6th Cir.1989), we observed that such a laconic marginal ruling "complicates appellate review of the lower court decision" by forcing this court to speculate about the rationale underlying the district court's decision. See id. at 353-54. This observation is particularly apropos where, as in this case, the motion for a new trial decided by marginal order is subject to a deferential "abuse of discretion" standard of review
 
 
 [6]
 We disagree with Bradford's assertion that Tiger Tail gives brokers an unfettered right to liquidate all accounts that are technically undermargined due to brokerage margin calls. In Tiger Tail, the customer did not (and, in fact, could not) challenge the margin call as unreasonable or in bad faith; the margin increase that led to the liquidation at issue in Tiger Tail was implemented by the Chicago Board of Trade, not the brokerage firm. See Tiger Tail, 674 S.W.2d at 701. Instead, the customer attacked the broker's failure to allow "a reasonable time within which to meet its margin requirements[,]" see id. at 702, and the Tennessee Supreme Court ruled that such a dispute created a jury issue on the facts of the case. See id. Here, the customer's sole challenge concerns Bradford's good faith in setting and then immediately imposing a six-fold increase in the margin requirement. This, too, creates a jury question under the logic of Tiger Tail
 
 
 [7]
 Tiger Tail dealt with an unauthorized coverage of a short sale, rather than the improper liquidation of a long position. Tiger Tail, 674 S.W.2d at 703. In a case such as Tiger Tail where a broker covers a short sale at an allegedly inflated price, the customer can assert that it could have covered at a lower price, thereby avoiding the loss incurred through the broker's improper coverage. See id. at 704. Here, the customer's argument is that the broker liquidated its contracts for a price that was too low, and that it incurred damages by having to reestablish its contracts for delivery at a higher price. The broker in this case then may reduce the customer's recovery of the difference between the liquidation price and the price actually paid to reestablish the liquidated position by proving that, within a reasonable time following liquidation as defined by the jury, the customer could have reestablished its position at a lower price than it obtained in reentering the market
 
 
 [8]
 Reasonableness in this context is a function of the customer's ability to retain a broker for the purpose of reentering the market and the customer's financial position following liquidation, i.e., how quickly the customer can raise the money necessary to reestablish its positions. That is, a customer cannot reasonably be expected to reestablish its liquidated positions until it has both the connection and the capital necessary to reenter the market
 
 
 [9]
 A nondiscretionary account is one in which "the customer must give prior approval for all transactions." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng, --- F.2d ----, ---- (D.C.Cir.1990) (No. 89-7169)
 
 
 [10]
 Thomson McKinnon Sec., Inc. v. Moore's Farm Supply, Inc., 557 F.Supp. 1004 (W.D.Tenn.1983), illustrates that the broker's failure to follow the customer's instructions can result in liability
 
 
 [11]
 We express no opinion as to whether Bradford may be entitled to a directed verdict on Dahlonega's breach of fiduciary duty claim under the standards set forth in this opinion. To ensure that the fiduciary duty claim receives proper consideration if left to the jury for resolution, however, "the district court should instruct the jury that fiduciary duty in the context of a brokerage relationship is only an added degree of responsibility to carry out pre-existing, agreed-upon tasks properly." Hill, 790 F.2d at 825