**Victor M. JAVITCH, Receiver,**
**Plaintiff,**

v.

**FIRST MONTAUK FINANCIAL**
**CORP., et al., Defendant.**

**No. 3:01 CV 941.**

United States District Court,
N.D. Ohio,
Western Division.

Sept. 5, 2003.

---

Robert E. Cahill, Roger A. Hipp, Brzytwa, Quick & McCrystal, Matthew P. Moriarty, Tucker Ellis & West, Michael D. Slodov, Javitch, Block & Rathbone, Cleveland, OH, for Plaintiff.

Phillip C. Kosla, Janik & Dorman, William J. Muniak, Mansour, Gavin, Gerlack & Manos, Andrew J. Dorman, Brian T. McElroy, Jonathan W. Philipp, Janik & Dorman, Cleveland, OH, for Defendants.

## MEMORANDUM OPINION

KATZ, District Judge.

### INITIAL BACKGROUND

This case is an outgrowth of the *Liberte v. Capwill*[1] litigation which has spawned related litigation both in the state and federal courts. Victor M. Javitch is presently the Receiver[2] in the *Liberte* litigation. In that litigation, Liberte Capital Group, Inc. ("Liberte") and Alpha Capital Group ("Alpha") contend that James A. Capwill ("Capwill"), through the entities Viatical Escrow Services, LLC ("VES") and Capital Fund Leasing ("CFL"), unlawfully diverted investor funds escrowed for insurance premiums or awaiting placement in viatical contracts.

In his capacity as Receiver, Javitch is charged with protection of the property of VES and CFL, including but not limited to instituting such legal proceedings as "necessary or proper to preserve or protect the Receivership property ... as Receiver of VES and/or CFL, against VES, or against CFL in state or federal courts or adminis-

trative agencies of forums." *Id.*, Doc. No. 132. Most recently, the Court noted the Receiver's "efforts are necessary not only to vindicate interests within the strict confines of the entities in receivership, but in the direct and larger interest of the investor as well." *Id.*, Doc. No.1982. To this end, the Receiver has been "empowered to represent and pursue the interests of the investors directly." *Id.*

It is the Receiver's contention that "Capwill and CFL opened or caused to be opened brokerage accounts in their own names, and in the names of others, with First Montauk", funded with the monies not belonging to Capwill or CGL but those of the above mentioned investors. Compl., ¶ 20. Based upon his authority as Receiver, Javitch instituted the instant proceeding against the Defendants alleging, *inter alia,* that First Montauk and Paul Giarmoleo were negligent, breached their fiduciary duties, and committed violations of securities laws with regard to the accounts opened by Capwill.

Pending before the Court is the Defendants' motion for summary judgment, with attendant replies thereto. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1332. As the issues have been fully briefed and are ripe for disposition, the Court now turns to the parties' contentions.

### SUMMARY JUDGMENT STANDARD

As an initial matter, the Court sets forth the relative burdens of the parties once a

---

1. *Liberte v. Capwill,* 229 F.Supp.2d 799 (N.D.Ohio 2002) revolves around the viatical settlement industry. Plaintiff Liberte Capital LLC ("Liberte") and Intervening Plaintiffs Alpha Capital Group LLC and Integrity Management Partners, LLC (collectively "Alpha") were engaged in the business of purchasing life insurance policies from terminally ill policyholders willing to sell their rights to the policies. Liberte also solicited investors for policies on the lives of seniors without

terminal illness. Investors were solicited by Liberte and Alpha to purchase viatical life insurance investment programs whereby investors were matched in many cases with the policy on the terminally ill person or "viator".

2. Initially Frederick M. Luper was appointed Receiver on July 15, 1999; however, effective June 26, 2000, Javitch replaced Mr. Luper in that capacity.

motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Of course, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (*quoting* Fed.R.Civ.P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

On a motion for summary judgment, the Court will consider "[o]nly disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. Nonmaterial facts will not be considered. Neither will the judge attempt to weigh the material evidence or determine its truth. *Anderson v. Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510. The judge's sole function will be to determine whether there is a genuine issue for trial such that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (citations omitted).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. at 2511. Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

### CAPWILL'S INVOLVEMENT WITH MONTAUK

Capwill met Vince Norman ("Norman") in approximately 1998 through a cousin. After some conversations, Capwill offered to finance Norman's newly formed auto title business. Norman understood that Capwill would put up money to get the business going "and to open up [a] brokerage account, buy stock and the money we would make from the stock, we would invest in [the business]." (Norman Depo., p. 37.) Near the end of August, Capwill took Norman to his friend, Tony Sandelier at Sandelier's office in Orlando, Florida. In his deposition, Norman related discussions revolving around the opening of brokerage accounts with First Montauk through Sandelier's friend, Paul Giarmoleo. Also at that time, Norman signed documents at Sandelier's office in order to open the accounts which he believed were for the pur-

pose of funding his business. Norman related that documents were placed before him for his signature which he understood were to open the First Montauk account. In addition, Norman testified that Capwill and Sandelier prepared the applications to open the account in name of Lalanya Jelens, a former girlfriend of Capwill. These documents were signed and sent by fax to Giarmoleo from Sandelier's office. It is undisputed that Norman's application to First Montauk listed his net worth at 5.1 million dollars, with a yearly income of $800,000 dollars. Norman testified that neither his yearly income or net worth were accurate on this application. *Id.* at 67–68. He also recalled signing a number of papers that day in Sandelier's office. According to Norman, the transaction was handled by Sandelier, Capwill and Giarmoleo and Norman did not recall speaking with Giarmoleo. *Id.* at 41–56.

Norman also testified that Giarmoleo advised him that Capwill and Sandelier "controlled" his account. *Id.* at 85. According to the record before the Court, the Norman account engaged in option trading. Such trades occurred in September 1998 but Norman testified that he signed the options agreement in October 1998, after the fact. Norman also testified that he never gave written authorization for Sandelier or Capwill to trade on his account. At one point in time, Norman received a call from First Montauk's compliance department and attempted to contact Capwill for further direction. When he was unable to reach Capwill, Norman contacted Giarmoleo, who assisted him in fielding questions related to this inquiry from the compliance department. Giarmoleo was aware, according to Norman, that directions regarding his account were to be taken from Capwill and Sandelier. *Id.* at 183. At one point, after Norman had retained counsel, he called Giarmoleo's supervisor in an attempt to cease trading on the account. *Id.*

Giarmoleo became acquainted with Capwill through Sandelier and was under the impression that Norman and Capwill were business partners. According to Giarmoleo, Norman opened the account in August 1998. In his deposition testimony, Giarmoleo stated that he spoke to Norman about the contents of his application and recalled, "They told me that he had four or five businesses. You know, the net worth was high. He said he had an account for two million bucks at Morgan Stanley." (Giarmoleo Dep., p. 87.)

Giarmoleo testified he spoke directly to Norman about his level of sophistication related to stock investments. For example, he stated that Norman told him about a two million dollar account at Morgan Stanley, the businesses Norman was involved in and stocks favored by Norman. *Id.* at 127–128. Giarmoleo did not seek independent verification regarding either Norman or Jelen's financial status but relied upon Sandelier's referral. *Id.* at 83–84. In fact, Giarmoleo never spoke with Jelen and stated the paperwork regarding her account was faxed from Florida, presumably from Sandelier's office. *Id.* at 80–81. With regard to both the accounts, Giarmoleo admitted he acted as both the broker and supervisor who approved the opening of the account. *Id.* at 84.

While Norman characterized himself as a novice in terms of stock buying or trading, Norman's status in terms of investing stands in stark contrast to Giarmoleo's characterization:

Q: Did you make any efforts with Vince Norman to determine his level of sophistication with respect to stock investments?

A: Yes.

Q: How did you do that?

A: I asked him.

Q: What did you ask him?

**A:** I asked him what his level of investment ability was. He said he had a $2 million account at Morgan Stanley.

**Q:** It could have started as a $10 million account and strayed down to two through stupidity?

**A:** He didn't tell me that.

**Q:** You don't know much by the level of the account?

**Mr. Philipp:** Objection to the form.

**Q:** Did you do anything other than what you just told me?

**A:** I asked him before what businesses he was in. He told me what businesses he was in. He told me that he made lots of money at Morgan Stanley as well as trading stocks, and one of his stocks he liked was Lernout & Hauspie. . . .

**Q:** Was there anything about Mr. Norman's trading activities in the September, October period of time that led you to conclude that he was sophisticated or led you to conclude that he was really unsophisticated?

**A:** Mr. Norman told me that he picks his own stocks. He also told me that I know what I'm doing ...

*Id.* at 127–129.

A few months after opening the Norman and Jelen accounts, Giarmoleo succeeded in getting Capwill to open an account. The funds for Capwill's account were transferred from Norman's account for repayment of a debt which Giarmoleo did not question. *Id.* at 90. Giarmoleo did not question the transfer of funds between accounts based upon the sole proprietorship letter from Capwill, *Id.* at 160, and Giarmoleo did not verify that Capwill owned CFL.

Contemporaneously, Giarmoleo was working on a side deal regarding Bentley Media and Capwill, *Id.* at 192, unbeknownst to First Montauk.

## DISCUSSION

### A. Negligence, Negligent Supervision and Breach of Fiduciary Duty

The Defendants submit there is no duty owed to the Plaintiff herein to investigate Capwill's source of funds. Characterizing Plaintiff's status as a third-party, any duty imposed by law, according to Defendants, is owed to Capwill, Norman or Jelen. The Defendants contend they had no knowledge Capwill was investing escrowed funds nor is there evidence to demonstrate the same. Moreover, due to the nature of the account, a non-discretionary account, the duties owed by the Defendants are slight, if any.

The duty of a broker to his customer is dictated by the discretion afforded the broker under the agreement. The Sixth Circuit agrees "it is generally accepted that 'no fiduciary duty arises between a broker and his client in relation to a non-discretionary [ ] account.' " *J.C. Bradford Futures, Inc. v. Dahlonega Mint, Inc.*, 907 F.2d 150, 1990 WL 95625 (6th Cir.1990) (unpublished). For example, in a discretionary account, the broker has a fiduciary duty since it is the broker who picks and authorizes selection of trades. *Id.*, citing *Commodity Futures Trading Comm'n v. Heritage Capital Advisory Serv., Ltd.*, 823 F.2d 171, 173 (7th Cir.1987) In this case, it is undisputed the accounts at issue were non-discretionary accounts, meaning they required the customer's authorization prior to implementation by the broker.

The existence of a fiduciary relationship, however, is called into question when there are factors leading to the broker-customer relationship which question whether it is the garden variety, arms-length relationship. *See e.g., Lehman Brothers Commercial Corp., v. Minmetals Int'l Non–Ferrous Metals Trading Co.*, 179 F.Supp.2d 118, 151 (S.D.N.Y.2000).

Such a factual determination is for the finder of fact. *Id., J.C. Bradford Futures, Inc.*, 907 F.2d 150, 1990 WL 95625, at *6.

■ Here, circumstances surrounding commencement of that relationship and its scope call into question the true nature of the relationship. The factors leading to this conclusion are multiple.

First, the standard in the industry is reflected in the rules of both NASD and NYSE. While this Circuit has yet to opine whether a private cause of action exists relative to infringement of those rules, they have been deemed to be the standards of practice relative to this industry. *See e.g., Miley v. Oppenheimer & Co., Inc.*, 637 F.2d 318, 333 (5th Cir.1981) (approving reference to violations of NYSE and NASD rules in an excessive trading case as one of several factors); *United States v. Bloom*, 450 F.Supp. 323 (E.D.Pa.1978); *Lange v. H. Hentz & Co.*, 418 F.Supp. 1376 (N.D.Tex.1976) (NASD rules can be used as evidence as to standard of care in the industry); *Stevenson v. Rochdale Investment Management, Inc.*, 2000 WL 1278479 (N.D.Tex.2000) (unpublished) (violation of the rules may be evidence of standard of care).

Under Rule 405(1) of NYSE:

Every member organization is required ... to (1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization.

Moreover, NASD rule 2310 requires suitability of the conduct relative to the customer's status as follows:

(b) Prior to the execution of a transaction recommended to a non-institutional customer, other than transactions with customers where investments are limited to money market mutual funds, a member shall make reasonable efforts to obtain information concerning:

(1) the customer's financial status;

(2) the customer's tax status;

(3) the customer's investment objectives; and

(4) such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer.

These provisions are referred to as the "know your customer" regulations and Giarmoleo indicated his familiarity with these regulations.

Second, First Montauk's own manual addresses the attributes of these regulations, including the following:

A. *Responsibilities Toward Customers*
The Registered Representative is charged with knowing his customers. He must know his client's financial resources and investment objectives. He must know as much about his client as the client will disclose ...

C. *Suitability*
The SEC, NASD and various other regulatory bodies require that a registered representative must have reasonable grounds to believe that a purchase or sale recommendation is suitable for a *particular* customer in view of that customer's investment objectives, financial situation and needs. This obligation mandates that before a recommendation is made, we must obtain adequate information that the customer [sic]. The regulators have taken the position that if a broker cannot obtain this information about the customer, he/she should not open the account....

E. *Know Your Customer*
The regulatory bodies require that due diligence is required to learn the essential facts about each customer. This is an ongoing obligation.

(Def's Ex. 11.) With regard to the opening of new accounts, First Montauk's compliance manual acknowledges the NASD Rules which require:

> [I]ts registered representative use diligence to learn the essential facts relative to every customer who opens a cash or margin account with the firm and every person holding a power of attorney over any account. It is the responsibility of the registered representative to obtain and present this required information to an appropriate supervisor (usually the Branch Office Manager or his designee prior to the opening of a new account ...)
>
> *New Account Form*
>
> ... As with all entries, care should be taken to ensure the accuracy of the facts noted on the form, since this document is frequently produced in regulatory inquiries and in civil lawsuits and arbitrations. Firm policy mandates thoroughness and truthfulness in preparing all new account documentation.

(*Id.*)

Third, the expert report of Jack Christiansen details the non-compliance by not only Giarmoleo in the opening and operation of the account but the lack of supervision due to the absence of any procedures for supervising branch managers. Christiansen's report raises serious allegations regarding a supervisory presence and the records before the Court corroborate that in many instances Giarmoleo both signed as the registered representative and approved his own agreements as the branch office manager. Moreover, the deposition testimony of Jeffrey Baber, who was in charge of compliance during the relevant time period, corroborates a loosely organized supervisory structure regarding branch managers. In addition, Giarmoleo's conduct in allowing third-party transfers or transfers between accounts, without conducting due diligence, could also be viewed as evidence of the lackadaisical atmosphere which First Montauk allowed its brokers to operate.

Fourth, First Montauk prohibited its brokers from engaging in outside placements, otherwise known as "selling away." The record reflects that as early as September 11, 1998, Giarmoleo was engaged in outside activities with Capwill with no notice to First Montauk. This is a clear prohibition of the First Montauk's internal regulations.

Fifth, the Capwill account, funded by transfers from the Norman account, was Giarmoleo's most lucrative account for which he received commissions of over $20,000 a month. A financial incentive was in place for Giarmoleo to accommodate Capwill and disregard industry standards and the brokerage firm's own regulations.

Although the Defendants dispute the duty owed was to anyone other than Capwill, Norman and Jelen, if at trial it is determined Giarmoleo was on notice the funds placed with First Montauk were escrowed, implicit in that knowledge is that the duty owed is not merely to the account holder but to the parties whose funds are at issue [3]. The characterization of Plaintiff

---

**3.** For example, during his testimony Giarmoleo was asked the following:

Q: Assume you knew or had strong reasons to suspect that the money going into the Jelen, Norman and Capwill accounts was escrowed money and that's all you know, that it was escrowed money, would you have permitted the type of trading that went on in those three accounts?

Mr. Phillip: Note my objection to the form.

A: No.

Q: Why?

A: Because if its is escrowed, it's for a purpose. It's used for a certain purpose. Just like a lawyer like you and the IOLA account. Somebody gives you money. You can't use it for whatever you want to

being a stranger to the account is dependent upon that factual determination. Thus, while Defendants' arguments are premised upon an absence of duty to investigate source of funds, no private right of action for violations of NASD/NYSE rules or a lack of fiduciary duty, such arguments disregard the record and disparities in testimony.

Viewing the testimony of Giarmoleo, Norman, Capwill and Sandelier, as well as the documents presently in the record, in the light most favorable to the Plaintiff, there exists more than a scintilla of evidence and there is a genuine issue of material fact with regard to what Giarmoleo knew about Capwill's business prior to opening his account. Additionally, Giarmoleo's conduct in opening and conducting all three accounts raises questions of fact as to whether the broker breached duties to the customer in light of the industry and brokerage firm standards. There are also genuine issues of material fact regarding First Montauk's supervision of its registered broker, who was also the branch office manager. As resolution of these factual questions goes to the heart of the fiduciary relationship, the Court cannot find as a matter of law that Defendants are entitled to summary judgment on the issues of negligence, negligent supervision and breach of fiduciary duty.

## B. Fraud, Conspiracy to Defraud, Aiding and Abetting Fraud

■ The elements essential to a claim of fraud include:

(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of mis-

leading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Gaines v. Preterm–Cleveland*, 33 Ohio St.3d 54, 55, 514 N.E.2d 709, 712 (1987) citing *Burr v. Stark Cty. Bd. of Commrs.*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986) paragraph two of the syllabus. A failure to prevail upon any of the necessary elements is fatal to a claim of fraud. *See Miller v. Knight*, 115 Ohio App. 485, 487, 185 N.E.2d 770 (1961).

■ An allegation of fraud "is maintainable not only as a result of affirmative misrepresentations, but also for negative ones, such as the failure of a party . . . to fully disclose facts of a material nature where there exists a duty to speak." *Textron Financial Corp. v. Nationwide Mutual Ins. Co.*, 115 Ohio App.3d 137, 153, 684 N.E.2d 1261 (1996). Thus, the nondisclosure of a relevant fact is tantamount to fraudulent concealment where a duty arises on the part of the person with knowledge of a material fact which impinges upon the relationship. A fact is deemed material where it "affect[s] the conduct of a reasonable person with reference to the transaction in question." *Leal v. Holtvogt*, 123 Ohio App.3d 51, 76, 702 N.E.2d 1246 (1998). In this case, assuming the jury finds Giarmoleo was aware Capwill was using escrowed monies to fund the First Montauk accounts, the jury could further find his failure to disclose these facts in light of a fiduciary duty rises to fraudulent conduct as it pertained to the investors. In light of the conflicting testimony among the principal players, summary judgment on the issue of fraud at this juncture of the proceedings is not warranted.

use it for. You have to use it for whatever the purpose is.

■ Conspiracy to defraud is established by:

> the parties in any manner com[ing] to a mutual understanding that they will accomplish the unlawful design; that the essential element of the charge of conspiracy (to defraud) is the common design, and that an affirmative fraudulent representation need not be shown, but that a concealment of the true nature of the transaction is sufficient to show fraud.'

*Pumphrey v. Quillen,* 102 Ohio App. 173, 141 N.E.2d 675 (1955), *aff'd* 165 Ohio St. 343, 135 N.E.2d 328 (1956). Moreover, "[e]xpress agreement is not necessary, and all that is required is that there should be a common design or understanding, even though it be a tacit one." *Id.* The evidence presently establishes a genuine issue of material fact regarding Giarmoleo's knowledge regarding Capwill's use of escrowed funds. Considering this together with the fact that Capwill's account was Giarmoleo's most lucrative account, the Court finds it is sufficient to withstand dismissal at this juncture of the proceedings.

Moreover, because the claims of aiding and abetting fraud, breach of fiduciary duty and breach of trust necessarily involve questions of fact on the underlying claim, those causes of action are not subject to summary judgment at this point in time.

### C. RICO

In order to demonstrate a violation under RICO, a plaintiff must establish the following elements:

> 1) that there were two or more predicate offenses; 2) that an "enterprise" existed; 3) that there was a nexus between the pattern of racketeering activity and the enterprise; and 4) that an injury to business or property occurred as a result of the above three factors.

*VanDenBroeck v. CommonPoint Mortgage Co.,* 210 F.3d 696, 699 (6th Cir.2000). The Defendants seek summary judgment under Count Six on the basis that the elements of causation and actual knowledge are insufficient to withstand judgment as a matter of law.

■ In this instance, the predicate offenses stated in the complaint include mail fraud, wire fraud and money laundering, see Compl. at ¶ 63, and charge defendants with engaging in prohibited activities listed in 18 U.S.C.1962 §§ (a) and (c)[4]. The civil remedies under RICO are contained at 18 U.S.C. § 1964 and Plaintiff's complaint seeks recovery under subsection (c) of the statute. While both parties argue their positions based upon the record, the language in the statute itself as it impacts the viability as to this cause of action requires preliminary examination before the Court can consider the merits of the claim.

The Racketeer Influenced and Corrupt Organizations Act ("RICO") was enacted

---

**4. Prohibited activities**

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce....

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

in the 1970s as a response to the war against syndicated crime and established both criminal as well as civil remedies. *See* Andrew P. Bridges, *Private RICO Litigation Based Upon 'Fraud in the Sale of Securities,'* 18 Ga. L.Rev. 43, 44 (1983). However, in response to a resulting flood of civil litigation, the Private Securities Litigation Reform Act ("PSLRA") of 1995 was passed to "deter[ ] the filing of some frivolous suits in federal court, but it also ma[d]e[ ] litigation on behalf of defrauded investors more difficult." *See,* Richard W. Painter, *Responding to a False Alarm: Federal Preemption of State Securities Fraud Causes of Action,* 84 Cornell L.Rev. 1, 34–35 (1998). These amendments addressed, for example, class action procedures, pleading standards, as well as discovery limitations. *See, e.g.,* American Law Institute–American Bar Association Continuing Legal Education July 24–26, 2003, Current Developments in Federal Securities Law, *Securities Law Disclosures After Sarbanes–Oxley,* Herbert S. Wander, SJ014 ALI–ABA 547. However, for purposes of the present discussion, it is the language contained in section (c) of the civil remedies section which gives the Court pause with regard to Count Six.

18 U.S.C. § 1964(c) states in pertinent part:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including reasonable attorney's fee, *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.*

(Emphasis added.)

The Plaintiff's RICO allegation is contained in Count Six as follows:

59. The wrongful conduct of Defendants constitutes a violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 and 18 U.S.C. § 1964.

60. Specifically, Defendants, by engaging in the acts described above, have received income derived, directly or indirectly, from a pattern of racketeering activity, and have used or invested such income, directly or indirectly, to operate the enterprises described in this Complaint, all in violation of 18 U.S.C. § 1962(a).

61. Additionally, at all times relevant herein, Defendants were associated with the enterprises described in this Complaint, and conducted and participated in the affairs of said enterprises through a pattern of racketeering activity, all in violation of 18 U.S.C. § 1962(c).

62. The wrongful activities of Defendants affected interstate commerce, as Defendants have used interstate mail, wire transfers, DTC securities transfers, and overnight delivery services to accomplish their wrongful activities.

63. Specifically, Defendants' pattern of wrongful conduct included, among other things, acts of mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and fraud by the conduct of financial transactions affecting interstate commerce in violation of 18 U.S.C. § 1956 and § 1957.

64. Defendants are under statutory and common law duties to prevent, or actively assist in preventing, money laundering, as that term is defined in 31 U.S.C. § 5340.

65. Mr. Capwill laundered money within the meaning of 31 U.S.C. § 5340, by removing funds from the accounts of the entities referred to in paragraphs 12 through 14 of this Complaint and others, placing them in accounts of the Defendants, and misusing, abusing, diverting, wasting and absconding with those funds for his own personal use or that of his friends, relative and business associates.

66. Defendants knowingly participated in the activities described in paragraph 65.

67. In the alternative, Defendants negligently, recklessly or wantonly ignored or permitted Mr. Capwill to engage in the activities described in paragraph 65.

68. Plaintiff is a person injured in its business or property by reason of Defendants' violations of 18 U.S.C. § 1962(a) and (c), and therefore has standing to sue pursuant to 18 U.S.C. § 1964.

69. As a direct and proximate result of Defendants' wrongful conduct and violations of 18 U.S.C. § 1962(c), Plaintiff, the entities referred to in paragraphs 12 through 14 of this Complaint and others (investors, funding companies, etc.) have been damaged in the amount not less than $2,075,096.00.

70. As a direct and proximate result of Defendants' wrongful conduct and violations of 18 U.S.C. § 1962(a), Plaintiff, the entities referred to in paragraphs 12 through 14 of this Complaint and others (investors, funding companies, etc) have been damaged in an amount not less than $2,075,096.00.

71. As a direct and proximate result of Defendants violations of 18 U.S.C. § 1962(a) and 1962(c) and 18 U.S.C. § 1964, Plaintiff, the entities referred to in paragraphs 12 through 14 of this Complaint and others (investors, funding companies, etc) are entitled to compensatory and consequential damages and to treble damages and the costs of this suit, including reasonably attorneys' fees.

Having read the entire complaint, it is clear that the wrongful conduct or activities complained of in count six pertain to the sale and purchase of securities with the use of investor monies. Moreover, it is the Defendants' conduct in the perpetration of these RICO violations of which Defendants are alleged to have knowingly participated or permitted to occur which form the basis of the predicate acts. It is in this context that the Court must consider whether they are viable in light of the 1995 Amendments.

The historical notes to these amendments characterize them as an "exception providing that no person may rely upon fraudulent conduct which would have been criminally actionable under section 1962 of this title as the basis for a civil suit under this section, unless the person who committed such fraudulent conduct has been criminally convicted, in which case the statute of limitations runs from the date the conviction becomes final." 1995 Amendments, Pub.L. 104–67, Title 1 § 107, effect. Dec. 22, 1995.

Federal courts applying this provision of the statute have been careful to consider the predicate acts as they relate to the sale or purchase of securities noting:

> [A] plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud. Allowing such surgical presentation of the cause of action here would undermine the congressional intent behind the RICO Amendment.

*Bald Eagle Area School Dist. v. Keystone Financial Inc.*, 189 F.3d 321, 330 (3d Cir.

1999). In *Bald Eagle* the plaintiffs were school districts who sued under RICO to recover funds lost in an alleged Ponzi scheme as against the bank acting as custodian for the districts' assets. The assets were misappropriated by plaintiff's financial advisor who was subjected to an action by the SEC. The plaintiffs attempted to argue that some, but not all, of the conduct at issue constituted securities fraud. However, the Third Circuit rejected such an approach noting that despite the fact that "[s]uch conduct may well constitute wire, mail or bank fraud, [ ] it was also undertaken in connection with the purchase of a security." *Id.*

Similarly, the Sixth Circuit, albeit in an unreported decision, made a similar determination in *Aries Aluminum Corp. v. King*, 194 F.3d 1311, 1999 WL 801523 (6th Cir.1999) (unpublished). There the plaintiff brought RICO claims against the defendants alleging fraud in the purchase and sale of counterfeit securities, which claims the district court dismissed pursuant to the 1995 Securities Litigation Reform Act. While the plaintiff argued it was not a purchaser or seller of securities because the securities were forged, the Circuit rejected that assertion since it did "not effectively circumvent the plain language of the statute nor the case law on the issue of fraud in connection with the purchase or sale of securities." *Id.* 194 F.3d 1311, 1999 WL 801523 at *3. Other federal courts are also in agreement. *See also, Howard v. America Online, Inc.*, 208 F.3d 741 (9th Cir.), *cert. denied*, 531 U.S. 828, 121 S.Ct. 77, 148 L.Ed.2d 40 (2000) (precluding RICO action where claims implicate conduct which could have been actionable securities fraud despite claimants' lack of standing to assert those claims); *Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Investments Ltd.*, 205 F.Supp.2d 243 (S.D.N.Y.2002) (investor sued under RICO alleging misrepresentations to induce investment in non-existent special class of shares in fund and claims were barred under PSLRA); *Burton v. Ken-Crest Services, Inc.*, 127 F.Supp.2d 673 (E.D.Pa.2001)(PSLRA precludes RICO suit which constitutes actionable securities fraud claims undertaken in connection with purchase and sale of securities); *In re Ikon Office Solutions, Inc. Securities Litigation*, 86 F.Supp.2d 481 (E.D.Pa.2000) (former employee's claims of fraudulent conduct actionable as securities fraud were barred under PSLRA); *Metz v. United Counties Bancorp.*, 61 F.Supp.2d 364 (D.N.J.1999) (former employee's RICO claim which arose out of securities fraud, mail and wire fraud was precluded by PSLRA); *Krear v. Malek*, 961 F.Supp. 1065 (E.D.Mich.1997) (noting conduct constituting predicate acts which are actionable securities fraud claims are excluded under PSLRA unless conviction exception applied and noting legislative history surrounding this amendment); *ABF Capital Management v. Askin Capital Management, L.P.*, 957 F.Supp. 1308 (S.D.N.Y. 1997) (PSLRA amendment removing securities fraud claims as RICO predicate acts barred investors' claim that hedge fund manager and broker-dealers participated in fraudulent RICO scheme to induce them to purchase securities issued by hedge funds).

In making a determination, the Court also considers the claims contained in Count Seven, which charge Defendants with Aiding and Abetting Fraud and Violations of the Securities Laws, stating:

72. Plaintiff incorporates by reference each and every allegations contained in paragraphs 1 through 71 of this Complaint as fully rewritten herein.

73. Mr. Capwill engaged in a fraudulent scheme to coax the investors whom Plaintiff represents to escrow and invest their funds with Mr. Capwill and/or other entities referred to in paragraphs 12 through 14 of this Complaint.

74. Defendants knew of or recklessly disregarded the possibility of fraudulent scheme enacted by Mr. Capwill.

75. Defendants gave substantial assistance to Mr. Capwill by enabling him to divert the investors' funds, which Plaintiff is attempting to recover on their behalf, *by conducting the securities transactions* which Mr. Capwill directed Defendants to make.

76. In so acting, Defendants have aided and abetted Mr. Capwill's fraud and his *violations of the securities laws, including 17 C.F.R. § 240.10b–5, 15 U.S.C. § 78j, and 15 U.S.C. § 78o.*

77. As a direct and proximate result of aiding and abetting Mr. Capwill's *fraud and his violations of the federal securities laws,* Plaintiff, the entities referred to in paragraphs 12 through 14 of this Complaint and others (investors, funding companies, etc.) have been harmed by suffering serious financial losses.

(Emphasis added.) Two of the provisions named in paragraph 76 detail the prohibited use of manipulative and deceptive devices in the sale or purchase of securities. Specifically, 17 C.F.R. § 240.10b–5 makes it unlawful:

(a) to employ any device, scheme, or artifice to *defraud,*

. . . . .

(c) to engage in any act, practice, or course of business which operates or would operate as a *fraud or deceit* upon any person, in connection with the purchase or sale of any security.

(Emphasis added.) As the alleged securities violations involve prohibitions against fraudulent conduct, this serves to confirm that the allegations fall within the precluded claims listed within 18 U.S.C. § 1964(c). "The amendment to the RICO statute excludes those fraudulent acts that would be actionable under securities laws." *Aries Al-uminum Corp. v. King,* 194 F.3d 1311, 1999 WL 801523 at * 3. Having duly considered the predicate acts as well as the securities violations alleged, this Court finds this conduct constitutes "conduct that would have been actionable as fraud in the purchase of sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). In light of this determination, the Court further finds the claims in Count Six cannot be litigated under RICO. Accordingly, Count Six of the Complaint is dismissed.

### D. Aiding and Abetting Fraud and Violations of Securities Laws

#### 1. Securities Laws

■ As to the claim of aiding and abetting violations of securities laws, the Supreme Court in *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), held there is no private right of action for an aiding and abetting suit under Securities Exchange Act § 10(b). In paragraph 76, the Plaintiff alleges violations under § 10(b) in the nature of 17 C.F.R. § 240.10b–5 (Manipulative and Deceptive Devices and Contrivances) and 15 U.S.C. § 78j (Manipulative and Deceptive Devices). Under the dictates of *Central Bank,* the claims based upon violations of § 10(b) are also subject to judgment as a matter of law.

■ In addition, the violations alleged under 15 U.S.C. § 78o addressing registration and regulation of brokers and dealers, are pled without any specificity so it is unclear which provision of this statute Defendants are charged with aiding and abetting. *See Lewis v. Hermann,* 775 F.Supp. 1137, 1153 (N.D.Ill.1991) (aiding and abetting securities fraud requires (1) a primary violation; (2) that positive law obliges the abettor to disclose the truth; and (3) the abettor fails to do so with the requisite degree of scienter necessary for a primary

violation). As the Defendants' motion on this issue remains unchallenged in Plaintiff's response, the claim of aiding and abetting this securities violation also is subject to judgment as a matter of law.

### 2. Aiding and Abetting Fraud

■ The claims for aiding and abetting fraud must, according to Defendants, be dismissed because Ohio does not recognize a cause of action for aiding or abetting common law fraud. *See, Federated Management Company v. Coopers & Lybrand,* 137 Ohio App.3d 366, 382, 738 N.E.2d 842, 853 (2000) (distinguishing cases offered by appellants as unpersuasive in supporting a claim of aiding and abetting fraud). However, just a few months following the appellate court's decision declining to acknowledge such a claim, the Sixth Circuit in *Aetna Casualty and Surety Co. v. Leahey Construction Co., Inc.,* 219 F.3d 519, 532–534 (6th Cir. July 13, 2000), tackled the issue of aiding and abetting fraud under Ohio law finding "no conflict between the position that an aider and abettor must have actual knowledge of the primary party's wrongdoing and the statement that it is enough for the aider and abettor to have a general awareness of its role in the other's tortious conduct for liability to attach."

In this instance, since a genuine issue of material fact revolves around Giarmoleo's knowledge regarding the source of funds, it impacts upon the claim of aiding and abetting fraud pursuant to the reasoning of *Aetna Casualty* and Defendant's motion for summary judgment on this aspect of Count Seven is denied.

### E. Conversion (Count Eight) and Money Had and Received (Count Nine)

#### 1. Conversion

■ Ohio courts have defined conversion as "the wrongful control or exercise of dominion over property belonging to another inconsistent with or in denial of the rights of the owner." *Kraft Constr. Co. v. Cuyahoga Cty. Bd. of Commrs.,* 128 Ohio App.3d 33, 41, 713 N.E.2d 1075, 1080 (1998) citing *Bench Billboard Co. v. Columbus,* 63 Ohio App.3d 421, 579 N.E.2d 240 (1989); *Ohio Tel. Equip. & Sales, Inc. v. Hadler Realty Co.,* 24 Ohio App.3d 91, 493 N.E.2d 289 (1985). In order to demonstrate a claim of conversion, the claimant must show that:

(1) he or she demanded the return of the property from the possessor after the possessor exerted dominion or control over the property, and (2) that the possessor refused to deliver the property to its rightful owner.

*Id.* "Money may be converted when it is identifiable and there is an obligation to return the specific money in question." *Kiss v. Dick Baker Dodge,* 1998 WL 904920 at * 3 (1998), citing *Schutt v. Bates,* 33 Ohio App. 303, 304, 169 N.E. 314 (1929).

■ In this instance, although it is uncontested Capwill used investor funds relative to the First Montauk accounts, the funds were placed in non-discretionary accounts effectively controlled by Capwill. There has been no showing there was a demand by Plaintiff upon the Defendants for return of the property. Moreover, the Defendants state at page 19 of their brief in support that such funds were eventually returned to the Receiver. Absent any evidence to the contrary, the Defendant's are entitled to summary judgment as a matter of law on Count Eight.

#### 2. Money Had and Received

■ Where a party to "a contract has fully performed and another party has been unjustly enriched," it may culminate in an action for money had and received. *National City Bank, Norwalk v. Stang,* 84 Ohio App.3d 764, 766–767, 618 N.E.2d 241, 242 (1992), citing *Hummel v. Hummel,* 133 Ohio St. 520, 14 N.E.2d 923 (1938). The

rationale underlying this claim is rooted in equity allowing recoupment from the party benefitting from the use of funds. *Id.* The court in *National City Bank* also held there were "occasions where an innocent party may be liable for restitution to a defrauded party." *Id.* 84 Ohio App.3d at 767, 618 N.E.2d at 243. An innocent party is liable to the extent he has been enriched and "only if there has been no change of circumstances making inequitable to require restitution." *Id.* citing *Oakley Bldg. & Loan Co. v. Murphy,* 84 Ohio App. 539, 84 N.E.2d 749 (1948).

 Unlike the defendant husband in *National City Bank,* the commissions earned by Defendants may constitute enrichment and there is also a genuine issue of material fact as to whether Defendants were in fact innocent parties or whether they had knowledge that Capwill was improperly utilizing escrow funds. *See Penalosa Coop. Exchange v. A.S. Polonyi Co.,* 745 F.Supp. 580, 589 (W.D.Mo.1990) (court denied dismissing money had and received claim where alleged broker was aware the embezzler used another's funds to pay for commodities trades). Therefore, to the extent that factual issues preclude a determination on this issue, Defendants' motion for summary judgment is denied as to Count Nine.

## CONCLUSION

For the aforementioned reasons, the Court grants Defendants' motion for summary judgment (Doc. No. 26) as it pertains to Counts Six, Count Seven (aiding and abetting securities violations) and Count Eight of the complaint and denies summary judgment on the remaining causes of action.

IT IS SO ORDERED.