NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0121n.06

Case No. 20-3423

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

Mar 09, 2021
DEBORAH S. HUNT, Clerk

THOMAS CALVEY,

    Plaintiff-Appellant,

v.

STIFEL, NICOLAUS & COMPANY, INC.,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

**O P I N I O N**

BEFORE: McKEAGUE, GRIFFIN, and NALBANDIAN, Circuit Judges.

**McKEAGUE, Circuit Judge.** After falling seriously ill with pancreatic cancer, Thomas Calvey ("Thomas") signed a Power of Attorney ("POA") giving his brother, James Calvey ("James"), authority to withdraw money from his accounts at his investment firm, Stifel, Nicolaus & Company ("Stifel"). Years later, Thomas sued Stifel for negligence and other claims, arguing that Stifel failed to properly verify the POA and so breached its duty of care in permitting James to withdraw over $300,000 from Thomas's accounts. After discovery, the district court granted Stifel's motion for summary judgment, finding that Thomas had failed to create a genuine issue of material fact on any of his claims.

Finding no error in the grant of summary judgment, we **AFFIRM**.

**I**

In 2012, Thomas Calvey ("Thomas") opened three investment accounts with an investment firm named Stifel, Nicolaus & Company ("Stifel"). The two individuals that Thomas communicated with most often were located at the Maryland office: his financial advisor, Theodora Braver, and her assistant, Meekie Shiflett. A few years later, in 2014, Thomas was diagnosed with pancreatic cancer. In January 2015, he called Braver from his hospital bed to discuss his condition and changes to his investments. Braver spoke to Thomas in February 2016 and noted his health had improved, and then spoke to him again in December 2016 regarding his accounts.

On April 10, 2017, Thomas signed a Power of Attorney ("POA") designating his brother, James Calvey ("James"), as the attorney-in-fact for all of Thomas's accounts at Stifel. The POA gave broad authority to James, authorizing him to "[c]onduct any business with any banking or financial institution with respect to any of [Thomas's] accounts, including, but not limited to, making deposits and withdrawals." The POA contained an acknowledgment indicating that Thomas read and understood it, and included the following section:

13. Notice to Third Parties

Any third party who receives a valid copy of this Power of Attorney can rely on and act under it. A third party who relies on the reasonable representations of my Attorney-in-fact as to a matter relating to a power granted by this Power of Attorney will not incur any liability to the Principal or to the Principal's heirs, assigns, or estate as a result of permitting the Attorney-in-fact to exercise the authority granted by this Power of Attorney up to the point of revocation of this Power of Attorney.

The POA was notarized, and the notary filed an affidavit indicating that he spoke with Thomas, that Thomas understood the POA and its contents, and that Thomas was of sound mind

and exercising his free will in signing the POA. There were also two witnesses to the signing of the POA.

Stifel received the POA in early May 2017. After reviewing the POA, Shiflett emailed her supervisor and indicated she thought Thomas's signature might not match his signature from other documents. However, reviewing POAs was the responsibility of the Stifel New Accounts Group, not individual employees at individual offices. The POA was sent to Stifel's New Accounts Group around May 8, 2017, which completed its standard extensive checklist regarding POAs and reviewed the relevant documents to determine if the signatures were similar. After completing this review, the New Accounts Group approved the POA around May 9, 2017.

On May 25, 2017, after James communicated with employees at Stifel regarding Thomas's worsening condition, James withdrew $312,000 from Thomas's account to purchase a home for Thomas and established a monthly distribution of $760–$1,520 to cover Thomas's living expenses. James submitted a form to Stifel to obtain authorization for the $312,000 transfer, and Stifel obtained verbal approval from James before the transfer took place. On June 16, 2017, James purchased a home titled in his and his mother's name. Later that year, James withdrew another $36,000 and told Stifel the money was to purchase a wheelchair van for Thomas. The total amount of money disbursed to James from Stifel was $361,680.

Around May 31, 2018, Thomas called Braver and told her that he survived pancreatic cancer, he never named James a POA holder, he had no house in his name, and no wheelchair van was ever purchased for him. Stifel refused to return any of the money to Thomas. In response, Thomas successfully sued James in Ohio state court seeking to recover the residence. In the

complaint in that case, Thomas claimed he was "duped . . . into executing a Power of Attorney for Financial Management which named [James] as [his] fiduciary."

Subsequently, Thomas sued Stifel in Ohio state court on April 2, 2019, for negligence, breach of fiduciary duty, conversion, and punitive damages. Stifel removed the case to federal court on April 25, 2019. Thomas's main claim against Stifel was its alleged failure to "properly verify" the POA before sending money to James, and all four of his claims stem from the same set of facts. After discovery, Stifel filed a motion for summary judgment on September 30, 2019. On February 14, 2020, the district court granted Stifel's motion for summary judgment, dismissing all of Thomas's claims.[1]

Thomas now appeals the summary judgment order dismissing all of his claims.

## II

### A. Standard of Review

We review the district court's grant of summary judgment de novo, *King v. United States*, 917 F.3d 409, 421 (6th Cir. 2019), and view all the evidence in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient" to avoid summary judgment; instead, "there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

### B. Negligence and Breach of Fiduciary Duty

The standards for negligence and breach of fiduciary duty in Ohio are similar. To prevail on a claim of negligence, the plaintiff must show that (1) the defendant owed him or her a duty of care, (2) the defendant breached that duty of care, and (3) the breach proximately caused the

---

[1] The district court also denied Thomas's motion to strike three affidavits, which he did not appeal.

plaintiff's injury. *Chambers v. St. Mary's Sch.*, 697 N.E2d 198, 200 (Ohio 1998). For a breach of fiduciary duty claim, the elements are the same except that the plaintiff must instead establish that the defendant owed them a fiduciary duty, which is a "heightened duty of good faith and loyalty." *Garvais v. Reliant Inventory Sols., Inc.*, No. 2:09–cv–389, 2012 WL 4057411, at *5 (S.D. Ohio Sep. 14, 2012). "A claim of breach of fiduciary duty is basically a claim for negligence that involves a higher standard of care." *All Star Land Title Agency, Inc. v. Surewin Inv., Inc.*, No. 87569, 2006 WL 3095701, at *6 (Ohio Ct. App. Nov. 2, 2006).

As Stifel served as Thomas's investment firm in charge of over $800,000 of his money, the existence of a duty of care is undisputed. Whether Stifel owed Thomas a fiduciary duty is a closer question. Ohio law describes fiduciary relationships as ones "in which one party to the relationship places a special confidence and trust in the integrity and fidelity of the other party to the relationship" and indicates that "there is general agreement that a broker or financial advisor is in a fiduciary relationship with his clients." *See, e.g.*, *Mathias v. Rosser*, Nos. 01AP–768, 01AP–770, 2002 WL 1066937, at *4 (Ohio Ct. App. May 30, 2002) (collecting cases). But other cases suggest that "no fiduciary duty arises between a broker and his client in relation to" accounts such as the ones here. *See Javitch v. First Montauk Fin. Corp.*, 279 F. Supp. 2d 931, 937 (N.D. Ohio 2003) (quoting *J.C. Bradford Futures, Inc. v. Dahlonega Mint, Inc.*, 907 F.2d 150, 1990 WL 95625, at *5 (6th Cir. 1990) (table)). The parties dispute this question, and we need not answer it. The outcome here would be the same even if Stifel owed Thomas a fiduciary duty of care. So, assuming without deciding that Stifel owed Thomas a fiduciary duty of care, we analyze whether Thomas has created a genuine issue of material fact on whether Stifel breached its duty of care to Thomas.

And that question turns on whether Stifel could rely on the POA that gave James broad authority to make withdrawals from Thomas's accounts. Ohio's Uniform Power of Attorney Act governs POAs in the state and confirms that signatures are "presumed to be genuine if the principal acknowledges the signature before a notary public." Ohio Rev. Code Ann. § 1337.25 (West 2019). Further, the Act provides that a POA executed after March 22, 2012 "is valid if its execution complies with section 1337.25 of the Revised Code." Ohio Rev. Code Ann. § 1337.26(A) (West 2019). In other words, POAs in Ohio are presumed to be genuine and valid if they are signed and notarized. The POA in this case clearly meets those requirements.

Third parties can rely on facially valid POAs like Stifel did here without facing liability. In *A.G. Financial, Inc. v. LaSalla*, No. 84880, 2005 WL 730092 (Ohio Ct. App. Mar. 31, 2005), the Ohio appellate court affirmed the granting of summary judgment to a defendant law firm when it relied on a POA that was allegedly forged by the plaintiff's brother. *Id.* at *4–5. The court held that because the POA was notarized and contained two witness signatures, and because the notary testified that she witnessed the plaintiff sign the POA, summary judgment was proper. *Id.* at *5–6. So too here. The POA in this case was notarized, had two witness signatures, and the notary witnessed Thomas sign it.

Indeed, Ohio law confirms that third parties have no duty to investigate the actions of valid POA holders. Financial institutions that possess valid POAs have "no duty to investigate every action that the holder of that power of attorney takes to ensure that each action is proper." *Townsend v. Williger*, No. 5:05-CV-02540, 2006 WL 721394, at *8 (N.D. Ohio Mar. 16, 2006) (granting summary judgment in favor of the defendant bank and confirming that even if the POA holder engaged in self-dealing, the bank "would be shielded from liability as it had no duty to police [the POA holder's] actions"); *Thrower v. Bolden*, No. 97813, 2012 WL 3765035, at *4

(Ohio Ct. App. Aug. 30, 2012) (affirming summary judgment in favor of the defendant bank when it relied on a notarized POA and rejecting the plaintiff's argument that the bank had a duty to investigate the POA holder's actions); *Gupta v. Lincoln Nat'l Life Ins. Co.*, No. 05AP-378, 2005 WL 3304019, at *3–4 (Ohio Ct. App. Dec. 6, 2005) (affirming summary judgment in favor of the defendant financial institution after it relied on a facially valid POA, even though the POA holder engaged in self-dealing).

These cases all establish the same principle: third parties must be able to rely on facially valid POAs to conduct their business. An Ohio court which so held has reasoned that requiring financial institutions to investigate the actions of POA holders before permitting withdrawal of funds would be "an onerous requirement" that "would not only be impracticable, but would essentially eliminate the power of attorney as a useful tool in the transaction of business of any elderly, disabled, absent, or otherwise incapacitated individual." *Gupta*, 2005 WL 3304019 at *4. And this straightforward principle governs the outcome of this case. The POA here was signed, witnessed, and notarized, and Stifel engaged in its normal process of verifying the POA before approving it. Once that process was complete, Stifel was entitled to rely on it. As these cases make plain, requiring Stifel to conduct further investigatory action before permitting James to make withdrawals would undermine the purpose of POAs and is not a requirement under Ohio law.

Thomas objects to the validity of Stifel's reliance on the POA in four ways, which we address in turn.

1. Thomas's Approval

Much of Thomas's briefing addresses how James was permitted by Stifel to make withdrawals without Stifel first seeking approval from Thomas. As discussed above, Ohio law

7

establishes that financial institutions need not investigate the actions of valid POA holders before permitting them to withdraw funds. Stifel was entitled to rely on the facially valid POA and did not need Thomas's approval to provide funds to James.

### 2. Thomas's Signature

Thomas accurately notes that Shiflett had concerns regarding his signature on the POA. But multiple Stifel employees confirmed that Shiflett was not a "handwriting expert" and that she had no experience or training in viewing signatures. Instead of relying on Shiflett's suspicions, Stifel followed its standard procedures in submitting the POA to the New Accounts Group, which reviewed the POA, checked the signatures, confirmed it was notarized, and then approved the POA. Thomas presents no evidence to the contrary on any of these points.

Further, Thomas entirely fails to address the affidavit of the notary public who notarized Thomas's signature on the POA. The notary confirmed he saw Thomas sign the POA, that Thomas understood the POA, and that Thomas appeared to be of sound mind while signing it. Additionally, in Thomas's complaint against James, he claimed he was "duped into" signing the POA, not that his signature was forged.[2] Accordingly, Thomas's arguments regarding his signature are unpersuasive.

### 3. Missing Page

Thomas claims that the lack of attention that Stifel paid to a "missing page" from the POA shows negligence. His evidence for this is that the POA's header goes from "Page 7 of 9" to "Page 9 of 9." Thomas claims that multiple employees from Stifel "did not see Page 8 was missing" and

---

[2] Thomas argues that it is inappropriate to consider this complaint because "pleadings are not evidence," nor are "[u]nverified complaints." He is wrong. "A party's pleading in one case may generally be used as an evidentiary admission in other litigation." McCormick, Evidence § 257 (8th ed. 2020); *see also Williams v. Union Carbide Corp.*, 790 F.2d 552, 556 (6th Cir. 1986) ("Pleadings in a prior case may be used as evidentiary admissions.").

so "this is [an] issue of material fact." Not so. If the missing page was from the early portion of the POA containing the material terms of the agreement, perhaps a missing page could create a genuine issue of material fact. *See, e.g.*, *First Star Logistics, LLC v. Bernard*, No. 1:16-cv-1070, 2020 WL 7698130, at \*1, \*6 (S.D. Ohio Dec. 28, 2020) (denying summary judgment because a contract was "undisputedly missing Page 6 . . . and the parties dispute what was contained on that missing page"). But that's not this case. Here, Page 6 of the POA contains the notary's stamp and two witness signatures**.** Page 7 is the notary acknowledgement form and Page 9 is a witness certificate for the second witness listed on Page 6. We need not make unreasonable inferences on summary judgment. Rather than assuming Stifel employees "did not see Page 8 was missing," it seems far more likely they simply assumed Page 8 was a missing witness certificate for the first witness. Indeed, evidence in the record suggests that some employees drew this exact conclusion, with one witness stating that if Page 8 contained "anything other than a witness certificate I'd be shocked." Regardless, Thomas fails to offer any explanation as to how this missing page could be material. Simply noting that the page is missing is insufficient, and Thomas's briefing offers no other inferences we could draw from this evidence other than the one above.

4. <u>Stifel's Procedures</u>

Lastly, Thomas claims that Stifel did not follow its internal procedures in handling his documents or transfers. For example, he claims that Stifel approved the $312,000 wire transfer without proper approval. Thomas is incorrect. Uncontested deposition testimony confirms that a manager at Stifel "talked to James" and received the requisite approval before wiring the money. Thomas's other claims fare no better. He claims that the funds were required to be held in a "POA bank account," but no such requirement exists. He claims that Stifel had a policy of looking for "unexplained and uncharacteristic withdrawals of large sums of money by . . . one with Power of

Attorney," but Stifel executives noted that "[e]very withdrawal had a valid explanation." We share the district court's concern that "there are instances in which [Thomas] takes testimony out of context" in his arguments.

\* \* \*

The record is unclear on whether James misused the money withdrawn from Thomas's accounts. But that is not the question before us. Instead, we must determine whether Thomas has created a genuine issue of material fact regarding whether Stifel breached its duty of care in relying on a facially valid POA that gave James authority to make those withdrawals. And after drawing all inferences in Thomas's favor, he has failed to create a genuine issue of material fact that Stifel breached its duty of care, even assuming a fiduciary duty existed. The POA was signed, witnessed by two individuals, and notarized. When Stifel received the POA, Stifel reviewed it using the same process it uses for reviewing any other POA by sending it to the New Accounts Group. This process entailed a signature review, after which the POA was approved. And Thomas offers no evidence to contest Stifel's valid explanations for its actions. In sum, a concern by one untrained employee regarding a signature that was later verified by Stifel's New Accounts Group, a missing page near the end of a POA, and alleged procedural failures without any evidence they occurred are insufficient to create a genuine issue of material fact here.[3]

### C. Conversion

A claim for conversion under Ohio law requires "(1) plaintiff's ownership or right to possess the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of Plaintiff's property; and (3) damages." *Kuvedina, LLC v. Cognizant Tech. Sols.*,

---

[3] As we have concluded that Stifel did not breach its duty of care, we need not address Stifel's argument that Stifel did not proximately cause Thomas's damages.

946 F. Supp. 2d 749, 761 (S.D. Ohio 2013). As discussed above, Thomas has failed to create a genuine issue of material fact on whether Stifel acted wrongfully in transferring funds from Thomas's account to James. Stifel lawfully transferred the funds pursuant to a valid POA, and so the conversion claim was properly dismissed by the district court.

### D. Punitive Damages

We have concluded that the district court properly dismissed all of Thomas's other claims, and "punitive damages are not an independent cause of action" in Ohio. *Hitachi Med. Sys. Am., Inc. v. Branch*, No. 5:09-cv-01575, 2010 WL 816344, at *11 (N.D. Ohio Mar. 4, 2010). "No civil cause of action in [Ohio] may be maintained simply for punitive damages." *Niskanen v. Giant Eagle, Inc.*, 912 N.E.2d 595, 599 (Ohio 2009) (quoting *Bishop v. Grdina*, 485 N.E.2d 704, 705 (Ohio 1985), *superseded on other grounds by change to* Ohio Civ. R. 54(C)). Therefore, we see no error in the district court's dismissal of this claim.

### III

Accordingly, we **AFFIRM** the district court's order.